## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PHYLLIS INDA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. CIV-24-00525-JD |
| | ) |
| STATE FARM FIRE & CASUALTY | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## <u>ORDER</u>

Before the Court is Defendant State Farm Fire and Casualty Company's ("State Farm") Motion for Summary Judgment ("Motion") [Doc. No. 54]. Plaintiff Phyllis Inda ("Inda") filed a Response [Doc. No. 70], and State Farm filed a Reply [Doc. No. 77]. State Farm also filed three motions seeking to exclude Inda's expert witnesses under Federal Rule of Evidence 702: Doug Heady [Doc. No. 55], Chris Branstetter [Doc. No. 56], and Sean Wiley [Doc. No. 57]. The Court has denied all three motions by separate orders. *See* [Doc. No. 78 (Wiley order)]; [Doc. No. 79 (Heady order)]; [Doc. No. 80 (Branstetter order)].[1]

For the reasons stated below, the Court denies State Farm's Motion for Summary Judgment.

---

[1] Citations to the parties' filings use CM/ECF designations from the top of district court filings for both page numbers and exhibit numbers. The Court uses the transcript pages for deposition testimony.

## I.    LEGAL STANDARDS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (citation modified); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). A dispute about a material fact is genuine if a rational trier of fact could find in favor of the nonmoving party on the evidence presented. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018); *see also Anderson*, 477 U.S. at 248 (explaining a dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). However, disputes over facts "that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. In applying this standard, the Court "review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant does not bear the burden of proof at trial, it may carry its initial burden by "pointing out to the district court" an absence of evidence to support the nonmovant's

case. *Id.* at 325. Once the movant has carried this initial burden, the burden shifts to the nonmoving party to "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation modified); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The nonmovant "may not rest upon the mere allegations or denials" in its pleadings. *Anderson*, 477 U.S. at 248.

Critically, the Court's function at summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The Court does not make credibility determinations; where the record presents conflicting accounts, it must credit the nonmovant's version. *See id.* at 255.

## II.    UNDISPUTED MATERIAL FACTS[2]

Phyllis Inda owns a residential property located in Shawnee, Oklahoma. [Doc. No. 54 at 9–10]. The home has a slate tile roof. *Id.* at 13–14. State Farm insured the property under a homeowner's policy covering, among other things, direct physical loss to the dwelling caused by wind and hail. *Id.* at 9–10.

On April 19, 2023, a significant storm struck the Shawnee area. The parties sharply dispute the severity of this storm. State Farm's investigation relating to the storm relied on AccuWeather data reporting wind speeds of 24 miles per hour with gusts up to 53 miles per hour at Inda's location. [Doc. No. 70-4 at 9]. Inda's expert meteorologist, Doug Heady, concluded that the property was struck by an EF-2 tornado generating wind

---

[2] This section includes material facts presented by both parties that are supported as required by Fed. R. Civ. P. 56(c)(1). If a party has asserted a fact, or asserted that a fact is disputed, but has failed to provide necessary support, the Court disregards the assertion. The Court states all facts in the light most favorable to the nonmovant, Inda.

speeds of 110 to 120 miles per hour. [Doc. No. 55-1 at 3]. The Court has found Heady's methodology reliable and his testimony admissible. *See* [Doc. No. 79 (Heady order)].

Inda filed a claim for storm damage. [Doc. No. 54 at 9, 12]. State Farm assigned an adjuster, Shawn Etienne ("Etienne"), to inspect the property. *Id.* at 12. Etienne generated an estimate below the policy deductible of $13,054. [Doc. No. 70 at 7]. On May 7, 2023, Etienne informed Inda that her estimated loss did not exceed her deductible and closed the claim. [Doc. No. 54-1 at 15; Doc. No. 54-5].

Inda retained a contractor, Joshua Wilson ("Wilson"), who inspected the property and submitted a $238,412.65 estimate, [Doc. No. 54-9 at 14], along with photos detailing damage to the dwelling and garage, *see* [Doc. No. 70-4 at 19]. Wilson's emails reflect that on May 17, 2023, he reminded Etienne of the need to provide Inda a copy of the estimate. [Doc. No. 70-4 at 17]. On May 26, 2023, Wilson again requested a copy of the estimate. *Id.* at 18. State Farm's claim notes reflect that Inda requested a copy of the estimate on May 9, 2023, and that a copy of the estimate had not been sent as of June 7, 2023. [Doc. No. 54-1 at 14]. Wilson sent his estimate on June 16, 2023; a follow-up email on June 26, 2023, requesting a response; and another follow-up email on July 11, 2023, recounting his telephone conversation in which State Farm "advised that none of the documentation [Wilson] submitted ha[d] been reviewed." [Doc. No. 70-4 at 19–21].

On July 14, 2023, State Farm assigned a second adjuster, Andrew Schumacher ("Schumacher"), through its vendor Alacrity, to reinspect the property. [Doc. No. 54 at 13–14; Doc. No. 70-7 at 3 (Tr. at 8:20–9:14)]. Alacrity manager Mr. Stacy Cathell ("Cathell") supervised Schumacher. [Doc. No. 70-7 at 15 (Tr. at 58:17–59:10)].

Schumacher's initial estimate was for full roof replacement at a cost of $102,543.67. [Doc. No. 70-4 at 4–5].

State Farm uses an internal calculation tool to determine whether a roof qualifies for full replacement or only spot repair. For slate roofs, if the cost to repair exceeds 80% of the cost to replace, the roof qualifies for full replacement. [Doc. No. 71-2 at 5 (Tr. at 13:8–11) (sealed)]; [Doc. No. 54-1 at 7]. To determine the number of tiles to replace, State Farm's adjusters count the damaged tiles they observe, then apply a repair factor— in this case a factor of two—to account for anticipated damage to other tiles during repair. [Doc. No. 71-2 at 5–6 (Tr. at 13:17–14:7) (sealed)].[3] After reviewing Schumacher's estimate, Cathell concluded the 80% threshold had not been met, and he instructed Schumacher to revise his estimate from full replacement to spot repair, ultimately paying Inda $39,203.58 in actual cash value and $2,582.35 in replacement cost value holdback. [Doc. No. 54-1 at 7]; [Doc. No. 54-8 at 1].

After receiving Schumacher's revised estimate, Wilson emailed Schumacher on September 13, 2023, noting "differences in opinions" on the scope of damage to the structure, and requesting Schumacher "verify receipt of th[e] email." [Doc. No. 70-4 at 22]. On October 10, 2023, Wilson emailed Schumacher again, saying "[i]t has been almost a month and we still have not received a response." *Id.* at 23.

---

[3] Whether this occurred is in dispute. Cathell testified that Schumacher's cost calculations incorporated the repair factor. [Doc. No. 71-2 at 5–6 (Tr. at 13:17–14:7) (sealed)]. Schumacher testified that he did not incorporate any repair factor. [Doc. No. 70-7 at 7–8 (Tr. at 29:5–30:6)].

On April 18, 2024, Inda filed this lawsuit in the District Court of Pottawatomie County. *See* [Doc. No. 1-1]. Inda served State Farm on April 24, 2024. [Doc. No. 1 ¶ 1]. On May 23, 2024, State Farm timely removed the action to this Court based upon diversity jurisdiction. [Doc. No. 1 ¶¶ 2–5].

III.   **ANALYSIS**

State Farm moves for summary judgment on Inda's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and punitive damages. The Court examines each in turn.

### A.  State Farm is not entitled to judgment as a matter of law on Inda's breach of contract claim.

State Farm is not entitled to summary judgment on Inda's breach of contract claim. The record reveals genuine disputes of material fact on the scope of covered damage, the proper method of repair, and the adequacy of State Farm's payment.

Under Oklahoma law, breach of contract requires proof of (1) formation of a contract, (2) breach, and (3) resulting damages. *Digit. Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21 ¶ 33, 24 P.3d 834, 843. Where the insurer and the insured dispute the value or scope of a covered loss, that valuation dispute is sufficient to sustain a breach of contract claim. *See Bales v. State Farm Fire & Cas. Co.*, No. CIV-22-851-D, 2024 WL 4230093, at *3 (W.D. Okla. Sep. 18, 2024) (holding that a genuine and material valuation dispute can sustain a breach of contract claim).

Because State Farm does not bear the burden of proof at trial, it may carry its initial summary judgment burden by "pointing out to the district court" an absence of

admissible evidence supporting the nonmovant's case. *Celotex*, 477 U.S. at 325. If State Farm makes this showing or negates Inda's evidence, Inda must then "go beyond the pleadings" and identify specific facts in the record creating a triable issue. *Id.* at 324. If State Farm carries its initial burden, the burden shifts to Inda to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. On rebuttal, Inda may not rest on "mere allegations or denials" but must point to record evidence from which a reasonable jury could return a verdict in her favor. *Id.* at 248.

### i. State Farm has not carried its initial burden to show the absence of a genuine dispute.

State Farm argues it fully compensated Inda for covered damage by paying $39,203.58 in actual cash value and $2,582.35 in replacement cost value holdback for roof repairs. [Doc. No. 54 at 23]. State Farm contends the slate roof was repairable and that its payment was adequate to cover the necessary spot repairs. *Id.* at 23–24. In support, State Farm points to the report and testimony of its expert, Derek Van Dorn ("Van Dorn"). *Id.* at 24.

The parties agree Inda's home sustained a covered cause of loss—they disagree on the extent of that loss. [Doc. No. 54 at 8–9]; [Doc. No. 70 at 5]. The parties' competing expert and lay witness testimony creates genuine disputes of material fact as to (1) whether the roof needed to be replaced in full rather than repaired; (2) whether the storm was severe enough to cause interior damage; and (3) whether the storm caused interior damage. Each of these disputes relates to whether State Farm's payment to Inda was adequate under the terms of the contract. The Court examines each dispute in order.

a)      Roof repair versus replacement

Inda's roofing expert, Chris Branstetter, opined that the slate roof requires full replacement—not spot repair—under industry standards given the level of damage. [Doc. No. 56-1 at 8].[4] This directly contradicts Van Dorn's testimony, opining that the roof was repairable. [Doc. No. 54-11 at 37]. This is a classic battle of the experts, outside the purview of summary judgment. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

Also disputed is whether Schumacher applied the repair factor before Cathell instructed him to revise the estimate from replacement to repair. *Compare* [Doc. No. 71-2 at 5–6 (Tr. at 13:17–14:7) (sealed)], *with* [Doc. No. 70-7 at 7–8 (Tr. at 29:5–30:6)]. If the jury concluded that no repair factor was applied to Schumacher's slate count, it could infer that State Farm's internal calculator should have triggered full replacement. This is a classic credibility dispute for the jury.

b)      Storm severity

The parties further disagree as to the severity of the storm. In its motion to exclude Inda's meteorology expert Mr. Heady, State Farm argued evidence on the severity of the storm was inadmissible because State Farm has admitted the existence of wind-caused damage. [Doc. No. 55 at 10]. The Court disagrees.

---

[4] The Court has separately denied State Farm's motion to exclude Branstetter's testimony and report. *See* [Doc. No. 80 (Branstetter order)].

"Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[] and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. The parties sharply disagree as to both (1) the extent of damage to the slate roof and (2) whether the storm caused damage to the interior of the structures. The disparity between AccuWeather's reported wind speeds (24 mph, gusts to 53 mph), [Doc. No. 70-4 at 9], and Heady's reported speeds (110 to 120 mph), [Doc. No. 55-1 at 3], goes directly to scope and causation of damage.[5]

c)     <u>Interior damage causation</u>

On interior damage, State Farm first argues that Inda's delayed reporting violated her duty to show a fortuitous loss under her all-perils policy. State Farm urges that "to shift the burden to an insurance carrier, a plaintiff must first prove that they suffered a covered loss not specifically excluded by the policy." [Doc. No. 77 at 8].

That argument misunderstands the structure of insurance law in Oklahoma. Under an all-perils policy,[6] the insured must show a *facially* covered loss that is "fortuitous." *Okla. Schs. Risk Mgmt. Tr. v. McAlester Pub. Schs.*, 2019 OK 3, ¶ 16, 457 P.3d 997, 1002. Then, the insurer bears "the burden of showing that a loss falls within" any exclusion. *Id.* State Farm fixates on *McAlester*'s statement that "[a]n 'all-risk' policy" is one that "cover[s] a loss . . . caused by any fortuitous peril not specifically excluded by the policy." *Id.* But that excerpt does not place the burden upon the insured to *disprove* an

---

[5] The Court has found Heady's methodology reliable. *See* [Doc. No. 79 (Heady order)].

[6] The Court uses "all-risks" and "all-perils" interchangeably.

exclusion. *McAlester* simply defines an all-perils policy—with its broad coverage of fortuitous physical loss—and then restates the basic rule that exclusions are not covered. *Id. McAlester* does not implicitly place upon the insured the very same burden that it explicitly places on the insurer.

State Farm next argues that its expert Van Dorn determined that four of five identified interior leaks were not storm-related and that interior settling cracks would have presented immediately after the storm if caused by tornadic activity. [Doc. No. 54 at 19]. Van Dorn further noted that a 2016 claim involved water intrusion in three interior rooms, suggesting pre-existing conditions unrelated to the 2023 storm. [Doc. No. 54 at 21]. Inda disputes this, pointing to Van Dorn's testimony that at least one interior leak could have resulted from the tornado. [Doc. No. 70-16 at 7 (Tr. at 54:13–17)].

Inda's expert Sean Wiley documented interior damage in numerous rooms with photographs and provided detailed, room-by-room repair estimates, attributing the damage to the nearby tornado. [Doc. No. 70-13 at 6–7]; *see generally* [Doc. No. 70-17].

As both Wiley and Van Dorn offer admissible testimony, their disagreement creates a genuine dispute of material fact. Moreover, under Inda's all-perils policy, State Farm bears the burden to prove that the interior damage falls within an exclusion—not the other way around. *McAlester*, 2019 OK 3, ¶ 16, 457 P.3d at 1002.

### ii. Inda has designated specific facts creating genuine issues for trial.

Viewing the evidence most favorably to Inda, the covered damage may vastly exceed State Farm's $39,203.58 payment. Wilson estimated $238,412.65 in total damage to the roof and exterior. [Doc. No. 54-9 at 14]. Schumacher's own initial estimate for just

the roof was $102,543.67. [Doc. No. 70-4 at 4–5]. Whether State Farm breached its policy by underpaying is a question for the jury, contingent on its conclusions regarding the extent of roof damage and the cause of interior damage. State Farm has not carried its initial summary judgment burden. Moreover, Inda has satisfied any rebuttal burden by directing the Court to specific facts on which a jury verdict in her favor may rest. The Court denies State Farm's motion for summary judgment on the breach of contract claim.

   **B.  State Farm is not entitled to judgment as a matter of law on Inda's bad faith claim.**

State Farm is not entitled to summary judgment on Inda's bad faith claim. Even assuming a legitimate dispute exists over the scope of damage, the record contains substantial evidence from which a reasonable jury could infer that State Farm failed to deal fairly and in good faith with its insured.

Oklahoma insurers have an implied duty to deal fairly and act in good faith with their insureds. *Christian v. Am. Home Assurance Co.*, 1977 OK 141, ¶ 25, 577 P.2d 899, 904. Bad faith claims demand "a clear showing that the insurer unreasonably, and in bad faith, with[eld] payment of the claim of its insured." *Id.* ¶ 26, 577 P.2d at 905.

The first step is to determine "whether there is a legitimate dispute between the insurer and the insured regarding coverage[.]" *Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1315 (10th Cir. 2019). A legitimate dispute exists when an insurer has "a good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding payment under the policy." *McCoy v. Okla. Farm Bureau Mut. Ins. Co.*, 1992 OK 43, ¶ 21, 841 P.2d 568, 572. Where the dispute is not legitimate, "the court may

11

infer that the insurer denied payment in bad faith" as a matter of law. *Shotts*, 943 F.3d at 1315.

To an extent, this logic functions in reverse: "[T]he fact that a reasonable jury could find in favor of the insurer based on all facts known or that should have been known by the insurer when it denied a claim is strong evidence that a dispute is 'legitimate.'" *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1442 (10th Cir. 1993) (citing *Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, ¶ 10, 681 P.2d 760, 762). And a lack of "conclusive precedential legal authority requiring coverage" also blocks a per se inference of bad faith. *Porter v. Okla. Farm Bureau Mut. Ins. Co.*, 2014 OK 50, ¶ 23, 330 P.3d 511, 518.

Nonetheless, "a 'legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith' or unreasonable conduct." *Haberman v. Hartford Ins. Grp.*, 443 F.3d 1257, 1270 (10th Cir. 2006) (quoting *Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 343 (10th Cir. 1995)). If a legitimate dispute *is* shown, the next question is "whether the plaintiff offered specific additional evidence to demonstrate bad faith," *Shotts*, 943 F.3d at 1315, such that "a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim," *Oulds*, 6 F.3d at 1436 (citing *McCoy*, 1992 OK 43, ¶¶ 21, 22, 841 P.2d at 572 (upholding jury's verdict for insured on bad faith claim due to the presence of "competent evidence which supports the jury's conclusion")). The Tenth Circuit has stated this operates to "shift[] the burden to the insured to present additional

12

evidence of bad faith." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006).

Oklahoma precedent identifies two categories of objectively unreasonable conduct that support a jury question on bad faith. The first is a sham justification, where the insurer "d[oes] not *actually* rely on that legitimate basis but rather denie[s] the claim for an illegitimate reason, such as a 'systematic, bad faith scheme of canceling policies without . . . good cause.'" *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1128 (10th Cir. 2012) (third alteration in original) (quoting *Vining v. Enter. Fin. Grp., Inc.*, 148 F.3d 1206, 1214 (10th Cir. 1998)) (applying Oklahoma law). The second is inadequate investigation because the "duty to timely and properly investigate an insurance claim is intrinsic to an insurer's contractual duty to timely pay a valid claim." *Brown v. Patel*, 2007 OK 16, ¶ 11, 157 P.3d 117, 122 (citation modified). Oklahoma's Uniform Jury Instructions specifically recognize that bad faith may be inferred where "the amount [the insurer] offered to satisfy the claim was unreasonably low." OUJI-Civil No. 22.2. This instruction underscores that the adequacy of State Farm's offer is not merely relevant to breach of contract—it is independently probative of bad faith.

Together, the federal summary judgment rules and Oklahoma's bad faith precedents mean that State Farm must first direct the Court to Inda's failure of proof on the absence of a legitimate dispute. If Inda fails to rebut this first prima facie showing, State Farm must then either point to her failure to "present additional evidence of bad faith," or else negate Inda's evidence on that issue. *Sims*, 469 F.3d at 891. If Inda also

13

fails to rebut that second prima facie showing, State Farm will be entitled to judgment as a matter of law.

State Farm argues there is a genuine disagreement over whether the roof needed full replacement or spot repair and whether the storm caused interior damage. [Doc. No. 54 at 27–28]. State Farm contends its reliance on its adjusters' findings was reasonable and that Inda's disagreement with the claim valuation does not, without more, establish bad faith. *Id.*

Inda argues that State Farm's handling of her claim went far beyond any legitimate dispute. [Doc. No. 70 at 5–6, 26–27]. According to Inda, State Farm populated its claim file with inaccurate AccuWeather data, sent adjusters with no experience inspecting slate roofs, ordered its second adjuster to change a full roof replacement estimate to a "spot repair" that violates industry standards, ignored detailed correspondence from Inda's contractor challenging the estimate, and failed to inspect the interior of the home despite obvious exterior damage. [Doc. No. 70 at 5–6, 18–19, 21–22]. Inda impliedly contends this pattern reflects a sham investigation, not a good-faith disagreement over valuation. [Doc. No. 70 at 26–27, 30–32].

Inda has produced substantial evidence of bad faith that goes well beyond a mere disagreement over valuation. The Court examines this evidence in turn.

### i. *The jury could find Etienne's initial inspection inadequate.*

The first adjuster, Etienne, determined that the loss did not exceed Inda's $13,054 deductible, [Doc. No. 70-4 at 14], on a property where Inda's contractor later assessed $238,412.65 in damage, [Doc. No. 54-9 at 14], and State Farm's own second adjuster

later estimated $102,543.67 for just the roof, [Doc. No. 70-4 at 5]. The disparity between Etienne's estimate and every subsequent evaluation of the property—including State Farm's own—permits a reasonable inference that his inspection was grossly inadequate. And State Farm initially denied payment and closed the claim based on that first inspection alone. [Doc. No. 70-4 at 14; Doc. No. 54-1 at 15].

Etienne closed the claim without providing Inda a copy of his estimate. [Doc. No. 70-4 at 14–15, 17]. And his letter stated: "We have completed our evaluation of your claim and have determined your loss does not exceed your $13,054 deductible. Therefore, we are unable to make a payment on this claim." *Id.* at 14. State Farm notes the letter's concluding invitation to call "[i]f you have questions or need assistance" but this standard addendum does not convert an unequivocal denial of payment on the claim into a tentative one. *See id.* Furthermore, neither adjuster inspected the interior of Inda's home—even though Cathell testified that doing so is ordinary adjusting practice. [Doc. No. 70-2 at 27 (Tr. at 126:14–22) (Cathell testifying that "the pattern and practice is we try to inspect the interior on all homes"); Doc. No. 70-2 at 32 (Tr. at 164:4–12) (Cathell confirming Schumacher's file note reads "Interior; not claimed or inspected"); Doc. No. 70-7 at 18 (Tr. at 72:13–19) (Schumacher confirming he did not enter the garage)].[7]

---

[7] State Farm repeatedly points out that Inda did not report interior damage in the initial claims process. But State Farm does not argue that this caused prejudice. *Fox v. Nat'l Sav. Ins. Co.*, 1967 OK 27, ¶ 20, 424 P.2d 19, 25 (holding an insurer must "show prejudice from non-compliance with the policy's provisions concerning written notice").

### ii. *The jury could find the adjuster's lack of experience with slate roofs unreasonable.*

Neither adjuster assigned to Inda's claim had demonstrated experience inspecting slate roofs. Schumacher testified that Inda's claim was the first and only slate roof claim he had ever handled. [Doc. No. 70-7 at 15 (Tr. at 61:18–23)]. He acknowledged that his knowledge of slate roofing came not from formal training but from "conversations with [his] manager." *Id.* at 8 (Tr. at 32:2–8). Etienne was not deposed,[8] and no record evidence establishes that Etienne had any experience evaluating slate roofs. Cathell, who supervised the claim, testified that he was not aware of any training materials or resources dedicated to slate roofing provided by Alacrity and that he had never trained his adjusters on slate or tile issues. [Doc. No. 70-2 at 41 (Tr. at 224:17–25); *id.* at 42 (Tr. at 236:20–237:1)].

When State Farm reopened the claim, it assigned Schumacher as the reinspection adjuster, even though he had never inspected a slate roof before and has not done so since. [Doc. No. 70-7 at 15 (Tr. at 61:18–23)]. Schumacher did not walk on the slate roof, nor did he apparently use drone footage to gain a closer view; he viewed the roof from the ground and adjacent flat roof sections. *Id.* at 8 (Tr. at 33:7–19). He did not inspect the garage roof from above or from the interior. *Id.* at 18 (Tr. at 72:13–19). Cathell acknowledged that slate roofing is "a different skill set" and that an adjuster needs to "know what [he or she is] doing and have experience in it" to properly evaluate such

---

[8] State Farm's final witness list notes that it "has been unable to locate Mr. Etienne; if he is located all parties will be advised and Defendant would anticipate calling him as a witness." [Doc. No. 42 at 2 n.1].

claims. [Doc. No. 70-2 at 32 (Tr. at 163:3–8)]. Schumacher arguably confirmed in deposition that State Farm trains its adjusters to consider loose shingles damaged, and a reasonable factfinder could conclude that Schumacher could not have fully assessed for this type of damage without walking the roof. [Doc. No. 70-7 at 9 (Tr. at 36:25–37:21)]. In sum, a reasonable jury could question the reasonableness of a damage assessment performed by an adjuster with no experience evaluating the type of roof at issue, and who did not physically walk the roof he was evaluating.[9]

### iii. The jury could find Cathell and Schumacher's conflicting testimony probative of a sham defense.

Cathell testified at his deposition that when repairing a slate roof, it is standard practice to apply a "repair factor"—doubling the damaged slate count—because removing and replacing damaged tiles often breaks adjacent tiles. [Doc. No. 70-2 at 32 (Tr. at 162:13–163:12)]. Schumacher, however, testified that he did not apply a repair factor. He estimated actual damage and merely "increas[ed] that number by a few . . . tiles" based on judgment. [Doc. No. 70-7 at 7 (Tr. at 28:1–12, 29:5–25)]. Cathell testified that he believed Schumacher had applied a repair factor. [Doc. No. 70-2 at 30 (Tr. at 143:5–24)].

This dispute, brought from the testimony of State Farm's own agents, goes to the calculation that may have determined whether Inda's roof qualified for full replacement under State Farm's own internal guidelines. Without the repair factor, Schumacher's

---

[9] Granted, Wiley did not walk the roof either. [Doc. No. 57-1 at 6]. But what difference that makes is a matter for the jury to determine.

repair cost percentages could have fallen below the 80% threshold that triggers full replacement. The difference between these two outcomes is the difference between a spot repair costing approximately $39,000 and a full replacement costing over $100,000.

The estimate was arguably deficient in additional respects. Despite State Farm's Trade Summary identifying eight different trades involved in the claim, [Doc. No. 54-4 at 21–22], and Schumacher's containing ten, [Doc. No. 54-7 at 13–14], Schumacher nonetheless concluded that overhead and profit was "not warranted due to lack of complexity involved in repairs and lack of coordination necessary to make those repairs." [Doc. No. 54-1 at 10]. Yet Cathell conceded that he "could see" adding overhead and profit when reconciling the contractor's objections. [Doc. No. 70-2 at 40 (Tr. at 219:20– 220:15); *cf. id.* at 32 (Tr. at 165:7–20)]. And Cathell further acknowledged that damage to the roof underlayment was not accounted for in the estimate, even though Schumacher's own repair plan would create at least 1,200 holes in the underlayment beneath the slate roof surfaces. *Id.* at 30 (Tr. at 143:5–12).

State Farm argues in reply that its determination of whether to add overhead and profit is a function of coordination complexity rather than the raw number of trades implicated. [Doc. No. 77 at 6]. But the number of trades involved in a repair is probative of that complexity, and the question of whether *this* claim was sufficiently complex is a weight and credibility determination for the jury.

A reasonable factfinder could draw multiple inferences from the conflicting testimony. First, a jury could believe Cathell's testimony that he thought Schumacher had applied the repair factor, making this a simple miscommunication. Second, a jury could

disbelieve Cathell and infer that the failure to apply the repair factor was deliberate—a mechanism to keep the percentage below the 80% threshold and avoid a more expensive full replacement. Third, a jury could infer bad faith from the process itself: State Farm sent a first adjuster who generated a below-deductible estimate, then a second adjuster who had never examined a slate roof, and the supervisor who never visited the property directed a reduction from full replacement to spot repair based on calculations that omitted a factor the supervisor himself described as standard practice. Which of these inferences a jury draws, if any, relies upon a credibility determination the Court cannot make at summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### iv. *The jury could find State Farm's communication delays unreasonable and probative of bad faith conduct.*

Wilson sent multiple, detailed emails to State Farm raising specific concerns about the estimate, including whether Schumacher had allowed a "reparability factor," missing items, color-matching problems, and PVC roof damage. *See, e.g.*, [Doc. No. 70-4 at 22]. Although State Farm eventually provided a revised estimate, it never responded to Wilson's specific concerns about the estimate's scope and methodology, and Cathell acknowledged at his deposition that "there were delays [in communication], yes." [Doc. No. 70-2 at 36 (Tr. at 203:6–204:10)]. A reasonable jury could find this repeated failure to engage with Wilson's concerns reflects a failure to deal fairly with the insured's claim.

Taken together, the foregoing evidence—viewed in the light most favorable to Inda—creates genuine disputes of material fact regarding the adequacy and good faith of

19

State Farm's investigation. The deficiencies span every stage of the claims process: the initial below-deductible estimate and unequivocal payment denial, the assignment of inexperienced adjusters, the conflicting testimony about standard repair calculations and omitted estimate components, and the failure to address the insured's contractor's detailed concerns. A reasonable factfinder could credit any combination of these facts to conclude that State Farm, at the time it adjusted Inda's claim, lacked a legitimate basis for its conduct. State Farm has not demonstrated the absence of a genuine dispute on this issue.

Even if a legitimate dispute exists as a matter of law, Inda carries her burden of production on rebuttal. *Sims*, 469 F.3d at 891. A reasonable factfinder may choose to disregard Cathell's deposition testimony that he believed the repair factor had been applied and instead conclude that Cathell intentionally disregarded Schumacher's incompetence to arrive at the lower number. Such a finding would lend the conclusion that State Farm's second estimate was a sham—precisely the type of "sham defense" that *Oulds* instructs courts to identify. *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1442 (10th Cir. 1993). Moreover, OUJI-Civil No. 22.2 specifically provides that a jury may find bad faith where the insurer's refusal to pay the claim in full was unreasonable under the circumstances because "the amount [the insurer] offered to satisfy the claim was unreasonably low." Given the magnitude of the disparity between State Farm's payment and every other assessment of the damage in the record, a reasonable jury could readily draw that inference here.

20

The record—drawn largely from State Farm's own personnel—raises genuine factual questions about the adequacy and good faith of State Farm's investigation that cannot be resolved on summary judgment. Inda has more than satisfied any rebuttal burden by pointing to substantial "additional evidence" of bad faith. *Sims*, 469 F.3d at 891. The legitimate dispute doctrine does not insulate State Farm at this stage. The Court denies State Farm's summary judgment motion on the bad faith claim.[10]

**C. State Farm is not entitled to summary judgment on punitive damages.**

State Farm also moves for summary judgment on the issue of punitive damages. This presents a closer question. But viewing the record in the light most favorable to Inda, the Court concludes that a reasonable jury could find reckless disregard by clear and convincing evidence. The Court, therefore, denies summary judgment on punitive damages.

Punitive damages for tort claims in Oklahoma are governed by 23 Okla. Stat. § 9.1. The statute establishes a tiered structure calibrating the availability and cap of punitive damages to the defendant's culpability. Under Category I, § 9.1(B), a jury may award capped punitive damages where it finds by clear and convincing evidence that

---

[10] State Farm argues that Inda "has not submitted evidence entitling her to compensatory damages for embarrassment, anxiety, frustration, and mental and emotional distress as alleged in her Petition." [Doc. No. 54 at 30]. State Farm points to OUJI-Civil No. 22.4, but it omits that financial losses also may be considered as bad faith damages by the jury. Thus, this argument does not fully dispense with the bad faith claim or damages relating to the bad faith claim. State Farm may re-raise this issue in a pretrial motion in limine to exclude Inda from alluding to embarrassment, anxiety, frustration, and mental and emotional distress if Inda failed to provide any evidence to State Farm of these damages in discovery.

"[t]he defendant has been guilty of reckless disregard for the rights of others," § 9.1(B)(1), or, in the insurer-specific context, that "[a]n insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured," § 9.1(B)(2). Category I does not require a showing of malice or intentional misconduct—those elements appear only in the statute's higher tiers, which impose correspondingly higher caps or no cap at all. *See* 23 Okla. Stat. §§ 9.1(C), (D). The operative question under Category I is whether the defendant acted with reckless disregard, not whether it acted with malice.[11]

Oklahoma's Uniform Jury Instructions aptly define the operative standard. An insurer "recklessly disregard[s] its duty to deal fairly and act in good faith with its insured" if it "was either aware, or did not care, that there was a substantial and unnecessary risk that [its] conduct would cause serious injury to" the plaintiff. OUJI-Civil No. 22.5. The instruction further provides that the insurer's "conduct must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to" the plaintiff. *Id.*

---

[11] Category I pertains only to reckless disregard. That malice can be *inferred* from a showing of recklessness does not collapse the mens rea distinction between Category I and Categories II and III in 23 Okla. Stat. § 9.1; neither party makes any argument to the contrary. Inda's four-page state court petition does contain a sentence alleging that "State Farm's acts and omissions were reckless, wanton and intentional with malice." [Doc. No. 1-1 ¶ 21]. But Inda makes no attempt to direct the Court toward any scintilla of evidence that might support the higher mens rea requirements of Categories II and III. Moreover, the record lacks evidence a rational trier of fact may rely upon to find such mens rea. For these reasons, the Court infers that Inda seeks punitive damages under Category I alone.

Punitive damages are not automatic in every bad faith case. *Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 2000 OK 55, ¶ 34, 11 P.3d 162, 175 (recognizing that "the availability of punitive damages in a bad faith case is not automatic, but is governed by the standard applicable in other tort cases"). Bad faith liability attaches at a culpability level above simple negligence, but the Oklahoma Supreme Court has recognized that it falls below the reckless-disregard threshold required for punitive damages. *See Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 28, 121 P.3d 1080, 1094 (explaining that "the minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award against said insurer"). Yet the two inquiries are necessarily related: where the evidence permits a jury to find that the insurer's claims-handling conduct was unreasonable and lacked any legitimate basis, that same evidence may also support a finding that the insurer recklessly disregarded a substantial risk that its conduct would cause serious injury.

Inda argues in her Response that "[m]ost federal courts now recognize that summary judgment on punitive damages is inappropriate where summary judgment is denied on bad faith." [Doc. No. 70 at 34]. The Court agrees, but for reasons grounded in the federal standard. Under *Hanna v. Plumer*, when a situation is covered by one of the Federal Rules of Civil Procedure, the federal court is "instructed to apply the Federal Rule." 380 U.S. 460, 471 (1965).[12] Federal Rule of Civil Procedure 56 governs the

---

[12] No party to this case has suggested that "the Advisory Committee, th[e] [Supreme] Court, and Congress erred in their prima facie judgment that" Federal Rule of

23

summary judgment inquiry. Under *Anderson v. Liberty Lobby, Inc.*, "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." 477 U.S. 242, 252 (1986). Courts "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Because section 9.1(B) requires clear and convincing evidence, the question on summary judgment is whether "the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

Inda cites *Estrada v. Port City Properties*, for the proposition that the Court must "submit a punitive damages question to the jury unless there is a complete lack of evidence to support an inference of the conduct required by" the statute. 2011 OK 30, ¶ 18, 258 P.3d 495, 503. But that is *Estrada*'s state court gatekeeping standard—it governs when an Oklahoma trial court submits a punitive damages instruction to the jury after the evidence has been presented at trial. *See id.* ¶ 20, 258 P.3d at 504 (explaining that once the trial court determines competent evidence exists, the statute then "guides the jury as to the many factors of conduct to consider, the level of conduct, and the degree of proof necessary to make an award of punitive damages"). *Estrada* does not define the standard a federal court sitting in diversity must apply upon summary judgment. Under *Hanna* and *Anderson*, Federal Rule of Civil Procedure 56 controls. The Court's inquiry thus centers on whether, viewing the evidence in the light most favorable to Inda, a

---

Civil Procedure 56 "transgresses neither the terms of the Enabling Act nor constitutional restrictions." *Hanna*, 380 U.S. at 471.

reasonable jury could find reckless disregard by clear and convincing evidence. *Anderson*, 477 U.S. at 255.

State Farm argues no evidence of reckless disregard is present—it contends the parties had a legitimate dispute about coverage and the scope of damage. [Doc. No. 54 at 30–31]. Implicit in this claim is the notion that $39,203.58 in actual cash value plus $2,582.35 in replacement cost value holdback appropriately reflected the professional judgment of its adjusters. *See id.* State Farm argues any disagreement over the amount owed or the scope of coverage is precisely the type of valuation dispute that precludes a finding of reckless disregard. *Id.* Inda essentially argues that the same evidence supporting her bad faith claim also supports a finding of reckless disregard. [Doc. No. 70 at 33–34].[13]

The primary evidence supporting a finding of reckless disregard concerns State Farm's own conflicting testimony about the repair factor. Cathell, who supervised Inda's claim, testified that the damaged-slate count in the estimate was doubled to account for tiles that would be damaged during the repair process. Cathell testified that "we," meaning he and Schumacher "doubled the calculation" again confirming his belief that State Farm "paid to replace . . . all[] [of the damaged slate tiles] . . . when we doubled it." [Doc. No. 70-2 at 30 (Tr. at 143:10–12, 16–24)]. Schumacher—the field adjuster who

---

[13] Inda makes this argument by asserting that most federal courts deny summary judgment on punitive damages where they deny summary judgment on the underlying bad faith claim. *Id.* at 34. Regardless of whether that is true, it does not serve as a rule (or as persuasive reasoning) on which the Court denies summary judgment in *this* specific case.

generated the estimate—gave directly conflicting testimony. When asked whether he multiplied his damaged-slate count by any waste or repair factor, Schumacher testified: "I don't do any math with the . . . amount of damage, other than just counting." [Doc. No. 70-7 at 27 (Tr. at 107:16–25)].

If the jury credits both Cathell's and Schumacher's testimony, it could find that State Farm's own supervisor described a calculation that the field adjuster never performed—on a determination that affected whether Inda's roof qualified for full replacement under State Farm's internal guidelines or only for a spot repair. The monetary difference between these outcomes is substantial. A supervisor who describes the doubling of the slate count as what "we" did, yet approves an estimate produced by an adjuster who applied no such calculation, could be found to have disregarded a substantial risk that the resulting estimate severely understated Inda's loss.

The repair-factor conflict is not an isolated incident. Cathell testified that State Farm's "pattern and practice is we try to inspect the interior on all homes" with Inda's type of claim. [Doc. No. 70-2 at 27 (Tr. at 126:17–22)]. But the interior of Inda's home was never inspected by Etienne or Schumacher. When pressed on whether, from his personal knowledge, Cathell knew if Inda was asked about interior damage, Cathell acknowledged: "I wasn't there for any conversations, no." *Id.* (Tr. at 127:22–128:2).[14] Cathell himself also never visited the property. Cathell testified that he "[does not] go out

---

[14] While State Farm argues Inda never mentioned interior damage, a jury examining this record could still infer—from expert testimony on the tornado and physical evidence on the condition of the property and its surroundings—that the need to inspect for interior damage was obvious and that failing to do so was reckless.

26

in the field too often as a[] [manager] because we're so busy" and that he "normally do[es] not go out in the field." *Id.* (Tr. at 129:1–6). Yet State Farm's own claim file noted the need for Cathell's "approval to send [another adjuster] to complete second inspection for damages missed on first inspection." *Id.* at 28 (Tr. at 132:20–24).

A jury could view the totality of State Farm's claims handling as reflecting conscious indifference to whether the process produced an accurate result, and inaccuracy obviously places Inda at serious risk of economic injury. The jury could believe that the individual responsible for supervisory oversight on Inda's claim admitted that multiple standard practices were not followed: (1) the slate count was not doubled as Cathell understood it should have been (and believed it had been), and (2) the interior was not inspected despite it being standard practice to do so. Further, Cathell never personally visited the property, did not know whether basic inquiries had been made of the insured, and approved an estimate produced by an adjuster who had never inspected a slate roof. *See* [Doc. No. 70-7 at 15 (Tr. at 61:18–23)].

The conflicting testimony of Cathell and Schumacher would alone suffice, but the jury could also infer reckless disregard from (1) the deficiencies of Etienne's initial inspection and his closure of the claim with a below-deductible estimate, (2) State Farm's month-long delay in providing a copy of the estimate to Inda, and (3) State Farm's multiple month-long delays in communicating with Wilson.

The Court cannot weigh the evidence or make credibility determinations at this stage. *Anderson*, 477 U.S. at 255.[15] But these are not mere valuation disputes of the kind that ordinarily preclude punitive damages. Inda points to admissible record evidence of sustained supervisory and communication failures that go to whether State Farm "was either aware, or did not care, that there was a substantial and unnecessary risk that [its] conduct would cause serious injury to" Inda. OUJI-Civil No. 22.5.[16]

Viewing the evidence in the light most favorable to Inda, a reasonable jury could find by clear and convincing evidence that State Farm recklessly disregarded its duty to deal fairly and act in good faith with its insured, failure of which carried a substantial and unnecessary risk of economic injury, all within the meaning of 23 Okla. Stat. § 9.1(B). The Court, therefore, denies summary judgment on punitive damages.

## IV.    CONCLUSION

For these reasons, the Court **DENIES** Defendant State Farm's Motion for Summary Judgment. [Doc. No. 54].

---

[15] In concluding that this body of admissible record evidence can sustain a jury's mens rea finding to a clear and convincing evidentiary standard, the Court does not inappropriately weigh the evidence. Any perceived tension here is an inherent feature of the summary judgment analysis that *Anderson* prescribes. And while Justice Rehnquist criticized this tension, his viewpoint did not carry the day. *See Anderson*, 477 U.S. at 271–72 (Rehnquist, J., dissenting) (arguing in dissent that *Anderson* "affords the lower courts no guidance whatsoever as to what, if any, difference the abstract standards that [the majority] propounds would make in a particular case" and averring that "engraft[ing] the standard of proof applicable to a factfinder onto the law governing the procedural motion for a summary judgment . . . will do great mischief with little corresponding benefit").

[16] State Farm does not argue that the valuation disparities implicated here do not constitute "serious" injury, nor could it reasonably do so.

IT IS SO ORDERED this 1st day of April 2026.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE